IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA K. HORN a/k/a MELISSA LESTER *Plaintiff* | : : : : : : : : : : | CIVIL ACTION<br><br>NO. 17-238 |
| v. | | |
| MINNESOTA LIFE INSURANCE COMPANY, *et al.* *Defendants* | | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                       APRIL 23, 2019

# MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Melissa K. Horn a/k/a Melissa Lester ("Plaintiff") filed an amended complaint against Defendants the Minnesota Life Insurance Company ("MLIC"), Securian Financial Network, Inc. ("Securian"), Affinion Benefit Group, LLC ("Affinion"), Doug Smith ("Smith"), and Capital One Bank (USA), N.A. ("Capital One"), for breach of contract and additional claims premised on Defendant MLIC's denial of a survivor's benefits claim under an accidental death and dismemberment group insurance plan issued to Plaintiff's father, Dorian K. Horn ("Horn"), and in which Plaintiff was a named beneficiary. [ECF 9]. Before this Court are Defendants MLIC, Securian, Affinion, and Smith's (collectively, "Defendants")[1] *motion for summary judgment* filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, [ECF 61], and Plaintiff's response in opposition. [ECF 65].[2] The issues raised by the parties have been fully briefed and are ripe for

---

[1]     On June 26, 2018, all claims against Capital One were dismissed pursuant to an agreement of the parties. Accordingly, only Defendants MLIC, Securian, Affinion, and Smith remain as active defendants in this matter.

[2]     This Court has also considered Defendants' reply. [ECF 68].

disposition. For the reasons set forth below, the motion is granted, and judgment is entered in favor of Defendants.

**BACKGROUND**

In the amended complaint, Plaintiff asserts the following causes of action: breach of contract against MLIC (Count I); quasi-contract and equitable relief against MLIC (Count II); violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") against Defendants (Count III); bad faith against MLIC and Securian (Count IV); fraud against Defendants (Count V); civil conspiracy against Defendants (Count VI); and negligence against Affinion (Count VII). At this summary judgment stage, this Court must consider all relevant supported facts in the light most favorable to the non-moving party, *i.e.*, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Those facts are summarized as follows: [3]

> MLIC is a Minnesota corporate entity which was the underwriter for the accidental death and dismemberment ("AD&D") insurance plan at issue in this matter (the "Policy").
>
> Securian appears to have been a Minnesota corporate entity which either owned MLIC or was owned by the same parent company as MLIC.[4]
>
> Affinion is a corporation that markets "group life and health" products to customers of its corporate clients, such as Capital One, and manages the marketing and billing of these products in exchange for a commission on the premiums paid by participants. Smith is an Affinion agent whose name and signature appeared on many of the official communications regarding the Policy and its predecessor.
>
> While the exact nature of the relationship between MLIC, Capital One, and Affinion has not been fully developed, it is undisputed that Affinion served as an

---

[3] The facts are taken from the parties' respective briefs and proffered statements of undisputed facts. To the extent facts are disputed, such disputes are noted and, if material, construed in Plaintiff's favor. Facts asserted by a party and supported by the record which are uncontested by the other party, whether directly or by implication, are taken to be true. *See* Fed. R. Civ. P. 56(e).

[4] Defendants contend that Securian is a dissolved entity irrelevant to Plaintiff's claims. Plaintiff has not challenged this contention. Accordingly, summary judgment is granted with respect to Plaintiff's claims against Securian.

intermediary between Horn and MLIC, and handled all billing and communications related to the Policy on MLIC's behalf. When Horn subscribed to the Policy, Affinion and Capital One had an official corporate relationship wherein Affinion billed premiums due under the Policy directly to Horn's Capital One credit card.

On November 26, 2010, Horn opened a credit card account with Orchard Bank. On October 3, 2011, Horn signed an "activation form," accepting an insurance policy offer "referred by" Orchard Bank consisting of a free $1000 in coverage. On the activation form, Horn checked a box which indicated his selection of an additional $300,000 in coverage and named Plaintiff as the beneficiary. [ECF 65-19]. The form indicated that the additional coverage cost was $1.10 per month per $10,000 of coverage, and that Horn's signature would authorize automatic quarterly charges to his Orchard Bank credit card account. At the bottom of the form, in smaller print, was the following notice: "Accidental Death and Dismemberment Insurance Underwritten by The United States Life Insurance Company in the City of New York" ("USL"), in addition to "Doug Smith" and the statement that "all benefits reduce by 50% at age 70." *Id.* At the time, Horn was 70 years old. [ECF 61-3 at 128: 3-7].

On November 1, 2011, the first $99.00 quarterly premium payment associated with the newly-activated $300,000 AD&D insurance coverage was charged to Horn's Orchard Bank credit card. [ECF 65-13 at 2]. The coverage ID number was 748952581. On May 8, 2012, Horn received a letter on USL letterhead, signed by Smith, memorializing Horn's enrollment in the $300,000 AD&D coverage and indicating that $99.00 premium payments would be charged to his Orchard Bank credit card on the first week of August, November, February and May of each year.

Sometime in 2011 or 2012, Plaintiff began helping Horn with his finances. [ECF 65-4 at ¶¶ 55-56]. In "2012 or 2013," Horn moved in with Plaintiff. Despite Plaintiff's help, Horn missed several quarterly insurance premium payments due to the insufficiency of his available credit on the dates the premiums were due.[5]

In May 2013, Affinion sent Horn a notice of the missed premium payment for the May quarter. Though this notice showed the missed May payment as being due on July 31, 2013, it indicated that "coverage may lapse prior to the premium due date" and suggested that Horn review the Policy documents "for details regarding the Grace Period." [ECF 65-21]. The notice further indicated that missed payments can only be paid by check or money order.

---

[5] Specifically, Affinion was unable to charge Horn's Orchard bank credit card for the payments due in November 2012, [ECF 65-13 at 20], February 2013, [ECF 65-13 at 29-32], and May 2013, [ECF 65-14 at 5], due to insufficient credit at billing time. The February payment was successfully charged in March 2013, after a $50.00 payment to Horn's card left enough credit free to bill the $99.00 February premium. [ECF 65-13 at 29-32; ECF 65-14 at 2-3].

3

Meanwhile, on May 5, 2013, a letter was sent to Horn on MLIC letterhead, signed by Smith, with the heading, "Important Information Regarding your Accidental Death and Dismemberment (AD&D) Plan through Capital One.[6] Minnesota Life Insurance Company will be your new Carrier." [ECF 61-5 at 1]. The letter indicated that Horn's AD&D insurance policy with USL would continue as "similar AD&D coverage," but underwritten by MLIC instead of USL, that the AD&D benefit and premium amount under MLIC would remain the same as it had been under USL, and that Horn's "continued payment of the premium [would] show [his] acceptance of the Minnesota Life AD&D insurance plan." [*Id.*]. The letter noted that the MLIC coverage would take effect on August 1, 2013, and included approximately 14 additional pages detailing the terms of the Policy. The final page of the Policy contained a section titled "Termination," which explained that the "insurance will terminate on the earliest of" several events, including "31 days after the due date of any premium which is not paid." [*Id.* at 15].

On August 27, 2013, another letter was mailed to Horn, signed by Smith, announcing the initiation of the MLIC Policy, "effective 08/01/2013 and . . . contingent upon successful collection of premiums during the insured's lifetime." [ECF 61-5 at 16]. The letter further indicated that "Capital One has made arrangements for your quarterly premiums of $99.00 to be charged to your credit card during the first week of: November, February, May, August. Please ensure that you have sufficient funds available on these dates and funds always remain available until the premium is debited from your account." [*Id.*]. This letter, like the May letter, was accompanied by the Policy documentation and the identical "Termination" provisions on the final page. [*Id.* at 17-29].

Horn's first $99.00 premium payment under the MLIC Policy was billed on August 1, 2013, and paid. [ECF 65-14 at 8]. However, Horn's credit card balance continued to hover within $99.00 of its limit, and as a result, his next two premium payments could not be charged on their scheduled due dates.[7]

Sometime in late November or early December 2014, the balance on Horn's Capital One credit card surpassed its $500 credit limit, where it would remain until April 2015. As a result, the $99.00 premium payment due in February 2015 could not be collected. Affinion did not notify Horn that the February 2015 payment had been missed and does not know why no notification was sent. The February 2015 quarterly premium was never paid.

---

[6]    On August 10, 2011, HSBC Finance Corporation sold its United States credit card business, including Orchard Bank, to Capital One. [ECF 61 at 5 n.3]. Nevertheless, Horn continued receiving credit card statements from Orchard Bank through May 2013. Sometime before August 2013, however, his Orchard Bank-branded credit card was apparently replaced by a Capital One-branded credit card.

[7]    Specifically, Horn's premium payments due in November 2013, [ECF 65-14 at 12], and February 2014, [ECF 65-15], could not be charged to his credit card due to insufficient available credit. However, in both instances, Horn's available credit increased sufficiently for the payments to be assessed a month later.

On April 2, 2015, Horn fell while at home, and Plaintiff took him to a hospital where he was admitted with a black eye. He was later transferred to UPMC Hamot in Erie, Pennsylvania, where he was diagnosed with a punctured lung and four broken ribs. [ECF 65-3 at ¶¶ 164-165]. While hospitalized, he developed pneumonia. [ECF 61-2 at ¶ 166].

On April 7, 2015, Plaintiff spoke with a Capital One representative about making a payment on Horn's credit card for "whatever is due." [ECF 65-4 at ¶ 165]. The representative asked Plaintiff, "the $173.00?" and Plaintiff replied, "Yes." Plaintiff transferred $200.00 from her checking account to Horn's credit card balance, and was told, "that will get you caught up." [ECF 65-15 at 18]. Plaintiff believed that the $200.00 payment would allow any outstanding Policy premium payments to be billed, but she did not ask the representative about Horn's insurance. [ECF 65-4 at ¶ 168]. Prior to the $200.00 payment, the balance on Horn's Capital One credit card had been over $600.00.

On April 16, 2015, Horn was discharged to home hospice care, and he died the following morning. [*Id.* at ¶¶ 170, 173-74]. Following Horn's death, Plaintiff submitted claims for benefits under the Policy. Despite Horn's failure to pay the final premium before he died, on the day of his death, Affinion sent a mailing indicating that his $300,000 in coverage was still in force. [*Id.* at ¶ 173]. On May 7, 2015, another Affinion representative discussed the Policy with Plaintiff and did not indicate that Horn had missed a payment or that the coverage had lapsed. [*Id.* at ¶ 177]. Plaintiff's claim was submitted to MLIC in late May, and on August 24, 2015, MLIC sent a letter to Plaintiff advising her that her AD&D claim was rejected on the basis that Horn's insurance had "terminated as of March 3, 2015," in accordance with the Policy's terms, due to Horn's failure to pay the February 2015 premium within the grace period. [ECF 68-2 at Exhibit Z].

The following is essentially undisputed: the material terms of the Policy; the contents of the any correspondence between Affinion and Plaintiff; the fact that Horn's February premium was never paid; and the fact that while Affinion customarily sent missed payment notices to insurance customers and had sent one to Horn in the past, no notice was sent regarding Horn's missed payment in February 2015.

**LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 56 governs the practice of summary judgment motions. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). As noted, under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). A party is entitled to judgment as a matter of law if the evidence is so one-sided that one party must prevail. *Anderson*, 477 U.S. at 251–52.

The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex*, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. *Anderson*, 477 U.S. at 249–50. In order to defeat a motion for summary judgment, there must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further, a party may

6

not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999). By evidence, Rule 56 means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49.

**DISCUSSION**

Plaintiff asserts seven distinct claims against Defendants. In their motion for summary judgment, Defendants argue that no genuine issue of material fact exists on any of Plaintiff's claims, and that each claim fails as a matter of law. This Court agrees with Defendants.

*Breach of Contract*

At Count I, Plaintiff asserts a claim for breach of contract against MLIC premised on MLIC's failure to notify Plaintiff of a lapse in coverage and to pay benefits following Horn's death. To establish a breach of contract under Pennsylvania law, Plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Here, the parties do not dispute that a contract existed between MLIC and Horn; namely, the Policy. The parties dispute, however, whether the Policy was appropriately terminated. Pertinently, the Policy explicitly indicates, under the bold heading "Termination," that insurance coverage will terminate "31 days after the due date of any premium which is not paid." [ECF 61-5 at p. 15]. In her

7

deposition, Plaintiff acknowledged the existence of this term. [ECF 61-3, Lester Dep. at 217:14-219:8]. Defendants contend, and Plaintiff does not dispute, that under the facts of this case, the Policy's explicit terms permitted termination in March 2015 following Horn's non-payment of the premium. Nevertheless, Plaintiff argues that Defendants' failure to provide notice of the missed payment breached the contract. However, Plaintiff cannot point to any evidence that the Policy required Defendants to provide notice of a missed payment or lapse in coverage. Indeed, the Policy contains no such provision. To the contrary, the Policy specifically provides for termination "31 days after the due date of any premium which is not paid." Such termination, without notice, is consistent with Pennsylvania law. *See Kentucky Cent. Life Ins. Co. v. Eagan*, 1994 WL 185031, at *3 n.4 (E.D. Pa. May 13, 1994) (rejecting legal relevance of insurer's failure to provide notice of lapse or nonpayment, where "the Policy itself contains no such notice requirements," since "[t]he relevant Pennsylvania statutes . . . do not require that the insurer send these types of notices.").

In support of the argument that a duty to provide notice existed, Plaintiff relies on *Johnson v. Concord Mutual Insurance Company*, 300 A.2d 61 (Pa. 1973), and on the "expert report" of Chaim Saiman (the "Saiman Report"), a professor of law at Villanova University.[8] [ECF 65-12]. Plaintiff's reliance on *Johnson* is misguided, as *Johnson* does not address either notice or termination and is therefore clearly inapplicable to the instant matter.[9] As to the expert report,

---

[8]   Defendants have challenged the admissibility of the Saiman Report at trial. [*See* ECF 71].

[9]   In *Johnson*, a 69-year-old plaintiff sought uninsured motorist benefits from an auto insurance provider even though, in purchasing the relevant policy, the plaintiff had signed a form which stated in fine print, "I hereby state that I do not desire uninsured motorist coverage in my auto liability policy." 300 A.2d at 62. The Supreme Court of Pennsylvania upheld the decision of the trial court to reject the waiver, holding that, given the public significance of uninsured motorist coverage, a written waiver of uninsured motorist coverage "is effective only if the waiver manifests the intentional relinquishment of this legislatively granted right of insurance protection." *Id.* at 65. While *Johnson* might be read to support the notion that

8

Professor Saiman reiterates the same legal arguments that appear in Plaintiff's responsive brief to support Plaintiff's theory that by providing a missed payment notice in May 2013, Affinion established a duty to continue to inform Horn of future missed payments and/or potential lapses in coverage.[10] Professor Saiman relies on *Couch on Insurance* for the proposition that "where unilateral cancellation by the insurer is predicated upon the nonpayment of premiums, it is generally required that the insurer give notice to the person obliged to pay the premium." 2 *Couch on Ins.* § 31.13. While that citation is accurate, the same treatise explains that "*cancellation* must be distinguished from *termination* of the policy *under its own terms* since in the latter case, notice is *not* generally required." *Id.* at § 30.2 (emphasis added).[11] As Plaintiff acknowledges, the Policy's termination aligned with the Policy's explicit terms. Under these circumstances, reliance on the cited section in *Couch* does not support Plaintiff's argument that Defendants' termination of the Policy required prior notice.

Likewise, Plaintiff's reliance on *Poch v. Equitable Life Assurance Soc.*, 22 A.2d 590 (Pa. 1941), is misplaced. In *Poch*, the Supreme Court of Pennsylvania held that under certain group policies, "the group policy cannot be cancelled. . . *except in a manner provided by the policy*, without giving [the insured] notice[.]" 22 A.2d at 594 (emphasis added). Here, the Policy was terminated due to non-payment consistent with the Termination provision.

---

in some cases, courts will decline to enforce insurance policy limitations embedded in the "fine print," automobile insurance and the public policy considerations attached to it are inapposite here.

[10] This Court notes that Affinion was not a party to the contract, and that Plaintiff's amended complaint asserts her breach of contract claim against MLIC only. However, MLIC did not communicate directly with Horn or Plaintiff prior to Plaintiff's submission of her claim in May 2015. Until that point, Affinion handled all outreach, billing, and customer service on MLIC's behalf.

[11] Further, "where the plain language of the policy provides that if the grace period expires without payment of an overdue premium, coverage terminates automatically, the fact that [the] insurer takes no affirmative steps to cancel [the] policy at that time is of no consequence." 2 *Couch on Ins.* § 31.5.

To the extent that Plaintiff intended to argue that sending a missed payment notice on a single prior occasion added, through course of performance, an implied term to the contract requiring future notice, Plaintiff is mistaken. Evidence of "past practice" can "only be admitted to resolve an ambiguity" in the contract. *Quick v. NLRB*, 245 F.3d 231, 247-48 (3d Cir. 2001). "There must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.'" *Id.* at 248 (quoting *U.A.W. Local 1697 v. Skinner Engine Company*, 188 F.3d 130, 146 (3d Cir. 1999)). Here, Plaintiff has not argued, nor can she, that the Policy was ambiguous with respect to whether Horn would be notified of missed payments of policy lapse. Moreover, even where evidence of past practice is admissible, a single instance of such practice is insufficient to support an implied contractual term. *Id.* at 247 (citing *Restatement (Second) of Contracts* § 202(4) cmt. g. (1981)). Thus, Plaintiff's argument that the missed payment notice sent in 2013 gave rise to an implied contractual requirement that future notice be provided, is legally unpersuasive and, therefore, without merit. Accordingly, Plaintiff's argument that MLIC breached any term of their contract fails.

Alternatively, Plaintiff argues that summary judgment is inappropriate because MLIC "waived any right it ha[d] under the policy to decline coverage for failure to pay premiums." [ECF 65-1 at 21]. Once again, Plaintiff's argument is misplaced. "In general, the waiver of a contractual right depends upon the doing of some act by the carrier from which the insured might reasonably conclude that the insurer would not insist upon one of its rights." *Martha Co. v. Nationwide Mut. Ins. Co.*, 473 F. Supp. 1029, 1041 (M.D. Pa. 1979) (citing *Schifalacqua v. CNA Insurance*, 567 F.2d 1255 (3d Cir. 1977)). "In order for conduct to constitute a waiver of a right of cancellation, the insured must be misled or lulled into some delay in the performance of his obligations by the

act of the insurer." *Id.* (citing *Brown v. Pa. Cas. Co.*, 56 A. 1125 (Pa. 1904)). Plaintiff contends that, as a result of Defendants' "erratic" processing of credit card payments, failure "to correct an obvious lack of understanding concerning the billing obligations," and failure to notify Horn of missed premium payments where notice had been provided under a prior policy, "Horn was lulled into inaction." Plaintiff principally relies on *Schifalacqua* for support. There, the United States Court of Appeals for the Third Circuit ("Third Circuit") held that "under certain circumstances, an insurance company waives its right to elect forfeiture *when it accepts a late premium payment*." *Id.* at 1257 (emphasis added). The *Schifalacqua* court, however, specifically limited recovery to the period *following* the insurer's acceptance of the late premium, observing that while payments are in default, "'the protecting power of the policy is suspended,'" and "'no recovery can be had.'" *Id.* (quoting *Lycoming Fire Ins. Co. v. Rought*, 97 Pa. 415 (Pa. 1881)). In the case *sub judice*, no payment was ever submitted to, much less retained by, MLIC or Affinion for the $99.00 premium payment due in February 2015. Moreover, even if Affinion *had* been able to eventually collect the outstanding premium from Horn's account, Plaintiff would not be entitled to benefits under *Schifalacqua*, given its holding that, even where an insurer accepts a payment after the expiration of a grace period, the insured cannot obtain recovery for events occurring while payments were in default. Horn died while the premium payment had been in default for more than 31 days.

Further, "[u]nder Pennsylvania law, a waiver is an intentional relinquishment or abandonment of a known right, claim or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act . . . and an evident purpose to surrender it." *Prusky ex rel. Windsor Retirement Trust v. Phoenix Life Ins. Co.*, 2005 WL 1754948, at *16 (E.D. Pa. July 26, 2005); *see also Shane v. WCAU-TV, CBS Television Stations, Div. of CBS, Inc.*, 719 F. Supp. 353, 357 (E.D. Pa. 1989) ("An analysis of the applicability of waiver focuses on the intent of the party

11

allegedly waiving rights . . . . Negligence, thoughtlessness, or oversight does not create a waiver. The intention to waive must be clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the party asserting the waiver.") (internal citations omitted). This Court finds that the erratic billing, lack of notice, and confusing responses to Plaintiff's phone calls, while examples of poor business practices, fall far short of any clear, unequivocal acts signaling MLIC's intent to surrender its right to deny coverage for nonpayment of premiums. Based on this analysis, this Court finds that Plaintiff's breach of contract arguments fail, and summary judgment is granted with respect to this claim.

*Equitable Relief*

At "alternative" Count II, Plaintiff asserts that MLIC should be estopped from denying her benefits on the grounds that, *inter alia*, MLIC was "unjustly enriched" by its receipt of premiums and refusal to pay benefits. [ECF 1 at p. 27]. By this assertion, it appears that Plaintiff intends both to bring a claim of unjust enrichment and to assert the doctrine of equitable estoppel, so both principles will be addressed.[12]

To sustain a claim for unjust enrichment under Pennsylvania law, Plaintiff must establish three elements, *to wit*: "'(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir 2008) (quoting *Limbach Co. LLC v. City of Philadelphia*, 905 A.2d 567, 575 (Pa. Commw. Ct. 2006)). Defendants contend

---

[12] In their motion, Defendants argue that Plaintiff's claim for promissory estoppel fails. However, Plaintiff does not claim that Defendants made any sort of "promise" outside of the contract and does not offer any response to Defendants' promissory estoppel argument. To the extent that Plaintiff may have intended to assert a claim of promissory estoppel, such claim fails.

12

that Plaintiff has failed to identify evidence establishing that MLIC retained an unearned benefit, *i.e.*, premium payment(s) for which coverage was not provided. In her response, Plaintiff does not attempt to identify any such evidence. Moreover, a claim for unjust enrichment "may not be stated where an express contract exists." *Martin v. Snap-Tite, Inc.*, 641 F. App'x 126, 130 (3d Cir. 2016) (citing *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012); *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006)). Undisputedly, Horn and MLIC were parties to an express contract. Under these circumstances, Plaintiff's claim for unjust enrichment fails, and summary judgment is granted with respect to said claim.

Plaintiff also appears to argue that Defendants should be required to pay the death benefit under the theory of equitable estoppel. "A party seeking to invoke equitable estoppel must establish three elements: (1) a misrepresentation by another party; (2) which the party reasonably relied upon; (3) to the party's detriment." *Palan v. Inovio Pharms., Inc.*, 653 F. App'x 97, 100 (3d Cir. 2016) (citations omitted). "'It is well established . . . that the burden rests on the party asserting the estoppel to establish such estoppel by clear, precise and unequivocal evidence.'" *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 504 (Pa. 1983) (quoting *Blofsen v. Cutaiar*, 333 A.2d 841, 844 (Pa. 1975)). Accordingly, "[t]he flexibility of the doctrine of equitable estoppel does not allow it to be imposed where the essential elements . . . are supported solely by speculation." *Id.* (citing *Blofsen*). Here, Plaintiff argues that she and Horn reasonably relied on Defendants' confusing billing and notice practices causing them to fail to ensure that Horn's February 2015 premium was paid. However, Plaintiff has not identified any actual misrepresentation by Defendants *prior* to Horn's death. Horn's premium payment was due in February 2015. Horn's demise occurred on April 17, 2015, more than 2 months after the premium payment was due. Any representation made *after* Horn's death cannot support Plaintiff's reliance argument. Moreover,

13

Plaintiff has not offered evidence that either she or Horn *actually relied* on Defendants' alleged practices in failing to pay the insurance premium. Without any evidence of actual reliance, Plaintiff cannot satisfy the elements of equitable estoppel and, therefore, this claim fails. Accordingly, summary judgment is granted with respect to Plaintiff's claims at Count II.

*UTPCPL*

At Count III, Plaintiff asserts that Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") by misrepresenting the nature of the insurance product including, *inter alia*, its "source, sponsorship, approval or certification"; its "uses, benefits or quantities"; and the insurance provider's "affiliation, connection or association with" other entities. [ECF 9 at 16]. The UTPCPL provides a private right of action for damages to "any person who . . . as a result of the use or employment of a method, act, or practice" made unlawful by the UTPCPL, "suffers any ascertainable loss of money or property." 73 Pa. Cons. Stat. § 201-9.2. "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004); *see also Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008) (holding that private plaintiffs pursuing claims under "*all* substantive sections of the Consumer Protection Law, fraud-based or not," must prove justifiable reliance).

Additionally, "the UTPCPL applies to the sale of an insurance policy. It does not apply to the handling of insurance claims." *Kelly v. Progressive Advanced Ins. Co.*, 159 F. Supp. 3d 562, 564 (E.D. Pa. 2016). Thus, to sustain a claim under the UTPCPL, Plaintiff must show that Horn relied on "the insurer's pre-[contract] formation conduct" in choosing to purchase the good or service in question. *Id.* Though Plaintiff has highlighted numerous instances in which the

14

corporate relationships between MLIC, Affinion, and Capital One were unclear, Plaintiff has produced no evidence that Horn relied on any misrepresentation made or any deceptive conduct when he chose to purchase the Policy. Consequently, Plaintiff's UPTCPL claim fails as a matter of law, and summary judgment is granted with respect to that claim.

*Bad Faith*

At Count IV, Plaintiff asserts that the handling of her claim under the Policy constituted bad faith, thus, entitling her to damages under 42 Pa. Cons. Stat. § 8371. Plaintiff contends that MLIC acted in bad faith by, *inter alia*, denying her claim, engaging in misleading marketing practices, failing to communicate regularly about its investigation, and acting in a manner prohibited by the Unfair Insurance Practices Act ("UIPA"), 31 Pa. Stat. § 1171.1 *et seq.* "To prevail on a bad faith claim, the insured must prove two elements: '(1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.'" *U.S. Fire Ins. Co. v. Kelman Bottles*, 538 F. App'x 175, 182 (3d Cir. 2013) (quoting *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005)). The insured must prove these elements by clear and convincing evidence, and "the insured's burden in opposing a summary judgment motion brought by the insurer is commensurately high." *Babayan*, 430 F.3d at 137 (internal quotations omitted). Here, this Court finds that MLIC had a reasonable basis for denying benefits; namely, Horn's premium had not been paid, and the grace period described in the Policy had expired at the time of Horn's death. As such, Plaintiff cannot prove the first element of her bad faith claim, and summary judgment is granted with respect to that claim.

Notwithstanding the foregoing, Plaintiff argues that Defendants' bad faith is evidenced by their alleged violation of the UTPCPL and "insurance regulations" such as the UIPA and the Unfair

15

Claims Settlement Practices regulations ("UCSP"), 31 Pa. Code §§ 146.1-146.10. However, Plaintiff is mistaken as these claims fail as a matter of law. *See Leach v. Nw. Mut. Ins. Co.*, 262 F. App'x 455, 459 (3d Cir. 2008) (holding that "insofar as [plaintiff's] claim for bad faith was based upon an alleged violation of the UIPA, it failed as a matter of law."); *Dinner v. U.S. Auto. Ass'n Cas. Ins. Co.*, 29 F. App'x 823, 827 (3d Cir. 2002); ("it is apparent from a comparison of bad faith standard [that the Pennsylvania Superior Court] adopted with the provisions of the UIPA and the UCSP that much of the conduct proscribed by the latter is wholly irrelevant" to the bad faith analysis);[13] *Watson v. Nationwide Mut. Ins. Co.*, 2011 WL 4894073, at *4 (E.D. Pa. Oct. 12, 2011) (observing that, since the current bad faith standard was established in *Terletsky*, "courts in the [Third] circuit have . . . refused to consider UIPA violations as evidence of bad faith."). Therefore, summary judgment is granted with respect to Plaintiff's claim of bad faith.

*Fraud*

At Count V, Plaintiff asserts a claim of common law fraud against Defendants. "To prove fraud, a plaintiff must establish six elements: 1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately caused by the reliance." *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2013) (citing *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534 (Pa. Super. Ct. 2003)). Defendants assert that Plaintiff can point to no evidence to establish that any false representations were intentionally made to Horn regarding the insurance coverage. In her response, Plaintiff does not challenge Defendant's argument or otherwise support her claim

---

[13] In 2017, the Supreme Court of Pennsylvania adopted the two-pronged test for claims under § 8371 first established by the Pennsylvania Superior Court in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994). *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 376 (Pa. 2017) ("[W]e conclude that the Superior Court's longstanding two-pronged test, first articulated in *Terletsky*, presents an appropriate framework for analyzing bad faith claims under Section 8371.").

16

of fraud. Absent proof of the elements of fraud, Plaintiff's claim fails. Accordingly, summary judgment is granted with respect to Plaintiff's common law fraud claim.

*Civil Conspiracy*

At Count VI, Plaintiff asserts a claim of civil conspiracy and argues that Defendants acted in concert to misrepresent the coverage offered to Horn with the intention that he would participate in the insurance offering and receive less than a fair exchange as a result. To prove a state-law claim for civil conspiracy, a plaintiff must establish: "'(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'" *Livingston v. Borough of Edgewood*, 430 F. App'x 172, 178 (3d Cir. 2011) (quoting *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)). Defendants argue that Plaintiff has not offered any evidence of any unlawful act, means or purpose and has not met her burden of proof. In response, Plaintiff merely recites the elements for a claim for civil conspiracy, and concludes that "each of these elements is satisfied." [ECF 65-1 at 33]. Such a response falls far short of Plaintiff's summary judgment burden to point to specific evidence that is more than "merely colorable, conclusory, or speculative." *Anderson*, 477 U.S. at 249-50. Accordingly, summary judgment is granted with respect to Plaintiff's civil conspiracy claim.

*Negligence*

Finally, at Count VII, Plaintiff asserts a claim of negligence against Affinion for its failure to send a missed payment notice in February 2015. "Under Pennsylvania law, a negligence claim has four elements: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting

injury; and (4) actual loss or damage resulting in harm to the interests of another." *Felix v. GMS*, 501 F. App'x 131, 134 (3d Cir. 2012) (quoting *Babayan*, 430 F.3d at 139). Defendants essentially argue that Plaintiff cannot identify evidence sufficient to establish any of these elements. In response, Plaintiff contends that Affinion's failure to send a missed payment notice led directly to Horn's failure to pay the premium, resulting in the injury of his lost coverage. Plaintiff has presented evidence, and Defendants do not dispute, that Affinion customarily sent notice of missed premium payments to its customers, and that Affinion sent a missed payment notice in May 2013 but failed to do so in February 2015. However, Plaintiff has offered no legal authority to support the proposition that Affinion's customary practice of sending notice, and its having sent Horn one such notice in the past, gave rise to a duty sounding in tort. This Court finds that Affinion owed Plaintiff no such duty. *See Drake v. Nat'l Life Ins. Co.*, 2018 WL 6329142, at *5 (E.D. Pa. Dec. 4, 2018) (finding that existing Third Circuit caselaw does not support the notion that an insured's reliance on an insurer's practice of giving notice can give rise to a duty sounding in tort). Therefore, Plaintiff's negligence claim fails as a matter of law, and summary judgment is granted with respect to that claim.

**CONCLUSION**

For the forgoing reasons, Defendants' motion for summary judgment is granted. Accordingly, judgment is entered in favor of Defendants. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.